# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 12 2016, 7:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer G. Schlegelmilch
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

Ne.K. & Ni.K. (minor children) and L.K. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

December 12, 2016

Court of Appeals Case No. 47A04-1607-JT-1600

Appeal from the Lawrence Circuit Court

The Honorable Andrea K. McCord, Judge

The Honorable Robert L. Bennett, Senior Judge

Trial Court Cause No. 47C01-1405-JT-139, 47C01-1405-JT-140

**Altice, Judge.**

## Case Summary

[1] L.K. (Mother) appeals the involuntary termination of her parental rights to Ne.K. and Ni.K. (the Children). Mother challenges the sufficiency of the evidence supporting the termination.

[2] We affirm.

## Facts & Procedural History

[3] Mother has two children, Ni.K. born in March 2004 and Ne.K born in March 2005. Father is not involved in the Children's lives.[1] The Lawrence County Department of Child Services (DCS) became involved with Mother and the Children on or about January 1, 2013, after receiving a report that Mother had been the victim of severe domestic violence. At the time of the report, Mother and the Children were living with Mother's abuser. Although the Children did not directly witness the incident because they were in another part of the house, they heard the commotion and saw Mother "all bloody". *State's Exhibit* 12 at 3. Mother was treated at a local hospital for injuries to her head, face, shoulder, back, and knee. Mother's abuser was arrested and a no-contact order was issued.

[4] Upon leaving the hospital, Mother and the Children went to Indianapolis to stay with Mother's father. Mother returned to her abuser's home the following

---

[1] The trial court also terminated father's parental rights, but he does not participate in this appeal.

day so that she would not be in violation of her probation.[2] Despite the no-contact order, Mother's abuser had been back to his home on several occasions while Mother and the Children were there. A Family Case Manager (FCM) spoke with the Children and they expressed fear over being in the house with Mother's abuser and that they felt unsafe. The Children described other incidents between Mother and her abuser and recounted how Mother's abuser would use a boat paddle to punish them and that it would "hurt really badly." *Id.* at 4. Several days after the incident, Mother changed her story, claiming that other individuals "beat her up." *Id.* at 3. Although Mother admitted that her abuser had threatened to kill her and the Children, she continued to insist that she and the Children were safe in his presence.

[5] On January 9, 2013, the Children were removed from Mother's care and placed with a foster family because Mother refused to enter into a safety plan for their protection. The following day, DCS filed petitions alleging the Children to be children in need of services (CHINS). At a fact-finding hearing on March 21, 2013, Mother admitted the Children were CHINS due to substance abuse and domestic violence issues.[3] By the time of the hearing, Mother had already completed an evaluation and was participating in counseling.

---

[2] Mother was on probation for possession of marijuana out of another county.

[3] Mother has a history of being involved in abusive relationships. In June 2010, Mother's then-boyfriend choked her and punched her. At the time of that incident, Mother's boyfriend had a restraining order against Mother.

[6] A dispositional hearing was held on April 24, 2013. DCS presented evidence that Mother was regularly visiting Children three times a week, but was intermittent with her participation in case-management services. Although DCS was not yet performing drug screens, the probation department reported that Mother was "testing positive." *Id*. at 15. DCS indicated that the primary focus at that time was to help Mother secure an adequate home and source of income. The permanency plan remained reunification of Mother and the Children. The court's dispositional order required Mother to, among other things, communicate with and follow directions of her FCM and other service providers, maintain suitable, safe, and stable housing, secure and maintain a legal and stable source of income, assist in the formulation and implementation of a plan to protect the Children from abuse or neglect, refrain from using drugs or alcohol, submit to random drug screens, and comply with the no-contact order.

[7] In May 2013, some case-management services were put on hold due to a lack of consistent participation by Mother. Mother, however, continued to visit with the Children. At a July 24, 2013 review hearing, a FCM reported that things were "moving slowly." *Id*. at 29. Of concern was that Mother had informed DCS that she was engaged to her abuser and that she was not going to move from his home. Indeed, the day before the hearing, Mother sent a letter to the court requesting that the no-contact order "be dropped" because it was "not right for him [her abuser] to be away from his own home." *DCS Exhibit* 15. Mother also informed DCS that she no longer wished to work with a home-

based case worker. It was further noted that two home-based caseworkers had asked to be taken off Mother's case due to intimidation by Mother.

[8] Against the requirements of the dispositional order, Mother remained in her abuser's home for several more months. During this timeframe, she participated regularly in supervised visits with the Children, showing up prepared and on time. At a December 19, 2013 review hearing, the court approved the DCS's continuing plan for reunification, finding that "appropriate progress continue[d] to be made." *Transcript* at 43.

[9] In January 2014, Mother sent a second letter in which she informed DCS and the court that her abuser "threw [her] out" of his home and that she had moved to Indianapolis. *DCS Exhibit* 14. Mother also asserted that her move to Indianapolis was to protect herself and "get [her] children home from foster care." *Id*. On account of her move, Mother requested that her case be transferred to Indianapolis. DCS denied Mother's request, but took steps to transfer some services to Indianapolis providers.

[10] Toward the end of January 2014, Mother stopped visiting with the Children because she did not have a driver's license and could not otherwise obtain transportation. Eventually, visits were reinstated in February 2014 after DCS arranged for the Children to be transported to Indianapolis once a week. Mother was advised that if she wanted additional visits with the Children, she had to meet halfway or find transportation from Indianapolis to Bedford to visit the Children.

[11] After her move to Indianapolis, Mother initially secured a four-bedroom house in which to live. In April 2014, Mother was referred to Midwest Psychological Services, where she participated in relapse prevention services, domestic violence counseling, and services to develop parenting skills. Mother, however, continued to use marijuana and drink alcohol and was very forthcoming with her counselor about her substance abuse as she did "not really see[] it as a problem." *Transcript* at 192. Over the course of a few months, Mother accumulated eleven positive screens for THC and one positive screen for oxycodone.

[12] Despite the fact that the permanency plan at the time remained reunification, DCS filed a petition for termination of Mother's parental rights (TPR Petition) in May 2014. A combined CHINS review hearing and initial hearing on the TPR petition was held on October 22, 2014. During the hearing, FCM Barbara Emmons noted that Mother's continued substance abuse was a barrier to reunification. The court also took note of a statement from the Children in which they indicated they were "ready to move on." *Id.* at 90. The court thus approved the change to the permanency plan from reunification to adoption by the foster family with whom the Children were residing. Based on the testimony of FCM Emmons, the court agreed that, but for a "goodbye visit," visitation between Mother and the Children should cease. *Id.* at 82. Mother has not visited with the Children since November 2014.

[13] At a January 7, 2015 permanency hearing, it was noted that at some point after the October 22 hearing, Mother was evicted from her home and forced to move

into a one-bedroom apartment, which she shared with her new boyfriend. Mother had also reported that she had been involved in a domestic violence incident with her boyfriend. Because Mother was the abuser in that incident, she was arrested. After her release, Mother was not permitted back in the home due to a protective order. FCM Emmons testified that Mother's participation in services had all but ceased since the October 22 hearing, thereby resulting in the referral for services being closed out in January 2015. Mother did not appear in person for subsequent permanency hearings in April, July, and November 2015.

[14] The court held an evidentiary hearing on the TPR petition on December 14, 2015, January 14, 2016, and March 10, 2016. The court issued its order, including findings of fact and conclusions of law, terminating Mother's parental rights on June 10, 2016. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[15] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous.

*In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[16] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[17] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the children and that there is a satisfactory plan for the care and treatment of the children. I.C. § 31-35-2-4(b)(2)(C), (D).

Additionally, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination."

*In re E.M.*, 4 N.E.3d at 643. Although trial courts are required to give due regard to changed conditions, this does not preclude them from finding that a parent's past behavior is the best predictor of their future behavior. *Id.*

[20] On appeal, Mother argues that the evidence is insufficient to support the involuntary termination of her parental rights. Mother does not challenge any of the court's findings of fact, but rather challenges only the court's conclusions that the reasons for placement outside the home would not be remedied and that termination was in the Children's best interests.

[21] In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home will be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). In doing so, the court may consider the parent's history of neglect and response to services offered through DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "A pattern of unwillingness to deal with

parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[22]     Based on its findings of fact, which are amply supported by the record, the trial court made the following conclusions:

> The Mother has failed to remedy any of the conditions that led to the removal of the Children and continued placement outside of the home.

> During the course of the CHINS case, she chose to continue to engage in abusive relationships, abuse illegal substances and engage in criminal behavior instead of participating in services offered and demonstrating her ability to fulfill her obligations as a parent. The Mother has failed or refuses to take the steps necessary to protect her children from being exposed to the drugs, violence and crime.

> The Mother has a history of violent relationships, substance abuse and criminal behavior. She has a history of and continues to live with boyfriends/roommates instead of securing stable housing of her own. Her living arrangements with these boyfriends/roommates at times before, during and after the removal of the children, have all involved incidents of severe domestic violence.

> The Mother's continued pattern of behavior, including substance abuse, violent domestic relationships, housing instability and lack of income sufficient to support the [C]hildren, together with her failure to demonstrate she has benefitted from any of the services offered or provided in an effort to reunite her with her children,

> compel the Court to conclude that there is a reasonable
> probability that the conditions resulting in the [C]hildren's
> removal will not be remedied. The Court is further of the
> opinion that such evidence additionally establishes that
> termination of parental rights is in the [C]hildren's best interest
> and that continuation of the parent-child relationship poses a
> threat to the [C]hildren's wellbeing.
>
> The Court does not need to and should not wait until the
> Mother's deficient lifestyle causes irreversible harm to the
> [C]hildren's mental, physical or social development before
> terminating the parent-child relationship.

*Appellant's Appendix* at 99-100.

[23]    As recognized by the court, domestic violence triggered DCS involvement and remained a concern throughout these proceedings. Indeed, Mother has a history of being involved in relationships plagued with domestic violence. The record also establishes that Mother continues to have issues with substance abuse, testing positive for THC on every drug-screen. Additionally, the record supports the court's conclusion that Mother failed to maintain a stable, safe residence in that she chose to live with her abuser for a period of time and thereafter was evicted from at least one residence for unspecified reasons. Although Mother engaged in some services, her participation was inconsistent and eventually led to the services being terminated. During a time when Mother seemed to be progressing, her therapist estimated that Mother had completed forty-five percent of the services offered before she stopped participating. Mother has not established that the trial court's conclusion that

there is a reasonable probability that the conditions or reasons for placement outside the home would not be remedied is clearly erroneous.

[24] Mother also challenges the court's conclusion that termination is in the Children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the trial court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride*, 798 N.E.2d at 199. "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child[ren]'s best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[25] Here, both the FCM and the Court Appointed Special Advocate testified that they believed termination was in the best interests of the Children. Both of these service providers indicated that Mother had not made sufficient positive change for the safety of the Children. By the conclusion of the termination hearing, the Children had been removed from Mother's care for over three years. In that time, the Children thrived in the home of their foster parents, who now desire to adopt them. The Children, now eleven and twelve years old, "seem[] excited about having permanency and getting adopted" by their

foster parents. *Transcript* at 218. The trial court's conclusion that termination is in the best interests of the Children is not clearly erroneous.

[26] Judgment affirmed.

[27] Bradford, J. and Pyle, J., concur.